**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X

In Re:                                                                CHAPTER 11

106 NORTH WALNUT, LLC,

                                                                      CASE NO. 05-15701 (MBK)



                                     Debtor.
--------------------------------------------------------X
106 NORTH WALNUT, LLC,

                                     Plaintiff,

- against –
                                                                      AD. PRO. NO. 05-02536 (MBK)
CITY OF EAST ORANGE, a municipal
corporation of the State of New Jersey,

                                     Defendant.
--------------------------------------------------------X

**APPEARANCES:**

Richard Seltzer, Esq.
436 Central Avenue
Jersey City, New Jersey 07307
*Attorney for Plaintiff, 106 North Walnut, LLC*

John F. Casey, Esq.
Wolff & Samson PC
One Boland Drive
West Orange, New Jersey 07052
*Attorneys for Defendant, The City of East Orange*

**MICHAEL B. KAPLAN, U.S.B.J.**


**MEMORANDUM DECISION**

## I.    INTRODUCTION

This case arises out of the demolition of a vacant apartment building owned by the

Plaintiff/Debtor, 106 North Walnut Street LLC ("Debtor") by the Defendant/City of East Orange

("City") on or about November 4, 2004. The Debtor sought to impose liability upon the City for

the demolition of the property under alternative theories of (I) inverse condemnation, (ii)

intentional, arbitrary and capricious conduct, and/or (iii) negligence. The Court conducted a trial

on non-consecutive days, concluding on October 18, 2007. For the reasons set forth below, the

Court determines that the Debtor has not proved its claim for inverse condemnation, or that the

City acted in an intentional, arbitrary and capricious manner in directing the demolition of the

building. However, the Court does find that the manner in which the City undertook the

demolition was both negligent and contrary to the law, giving rise to liability.

## II.    JURISDICTION

The court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and

157(a) and the Standing Order of the United States District Court dated July 10, 1984 referring

all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2)(I).   Venue is proper in this Court pursuant to 28 U.S.C. §

1409(a). The following constitutes the Court's findings of fact and conclusions of law as

required by Fed. R. Bankr. P. 7052.

## III.    FACTS AND PROCEDURAL HISTORY

### History of the Subject Property and Area Redevelopment

1.    The Debtor is a New Jersey Limited Liability Company formed on January 25,

2003, and which acquired  from Two Bits Properties, LLC ("Two Bits") a vacant apartment

building at 106 North Walnut Street, East Orange, NJ ("Subject Property") on March 17, 2003,

with the intent to rehabilitate the improvements and rent. Specifically, the Subject Property

consists of a 35,068 square foot four-story brick,  steel and wood frame building, comprised of 9

one-bedroom units, 18 two-bedroom units and 9 three-bedroom units. There is one passenger

elevator and parking available for 26 cars. The structure is located on 0.764 acre and is situated

in the R-4 Residential Multi-family District, in accordance with the zoning Ordinances of the

City of East Orange. Multi-family high-rise structures are permitted uses in this zone.

2.      Prior to the Debtor's acquisition of the Subject Property, on or about October 9,

2002, the Subject Property experienced fire damage to the upper floor and roof. As a result of the

fire damage, the City, by and through its Construction Official, Lloyd Raheem ("Raheem")

issued a Notice of Unsafe Structure and Notice of Imminent Hazard dated October 17, 2002.

The October 17, 2002 Enforcement Attachment stated that building had to be rehabilitated or

demolished because the fire had destroyed the roof and upper portion of the structure.

3.      Following the October 9, 2002 fire damage suffered by the Subject Property, the

building was examined twice by a licensed structural engineer, Andrew Wu, P.C., who issued

opinions that the building was structurally sound other than certain fire damage to the roof. He

updated this report on March 11, 2003 and reached the same conclusion.

4.      The Debtor paid $450,000 for the Subject Property. The Debtor financed the

acquisition of the Subject Property and renovation of improvements with a $416,000 mortgage

from Edge Capital, LLC.

5.      On or about January 29, 2003, Boneh Construction ("Boneh") issued Debtor's

principal a proposal to rehabilitate the Subject Property at a cost for rehabilitation of $380,000.

3

The plans to repair the building were reviewed by the City code officials and the Debtor entered into a contract with Boneh Construction to renovate the Subject Property at a cost of $380,000. The Debtor financed $305,000 of the renovations with a building loan from Edge Capital, LLC.

6.      On or about February 3, 2003, Raheem issued DaVinci Builders, a contractor for Boneh, City Building Permit 20030110 for a "roof repair" that was estimated to cost $31,000. Boneh had received a proposal from A.K.K.J. Electric Inc. for this work on July 11, 2003. Raheem testified that his understanding was that the permits were to correct what he believed to be the structural defects in the property and therefore did not demolish the building based on the 2002 Notice. As of December 2003, Debtor had replaced the building's roof and began installing new walls and framing inside the building located on the Subject Property.

7.      Pursuant to this contract, the Debtor made the following payments to Boneh Construction which aggregated to $107,500:

      a.      Powerhouse Realty Check 4296 dated March 19, 2003 for $10,000;

      b.      Rosenblum & Bianco, LLP Check dated April 8, 2003 to Boneh for $30,000 on behalf of Powerhouse;

      c.      Powerhouse Realty Check 4412 dated April 29, 2003 for $20,000;

      d.      Edge Capital Check 1092 dated July 21, 2003 for $38,000 and

      e.      Powerhouse Realty Check 4755 dated October 15, 2003 for $9,500

8.      Raheem served as a member of the East Orange Planning Board for several years during the relevant times including 2002 through 2007.

9.      On June 4, 2003, the City Council requested the East Orange Planning Board perform a study to determine whether the Subject Property was in need of redevelopment.  In early 2003, the City retained the Metro Company to prepare the investigation of whether an area named the North Walnut Street Redevelopment Area which included the Subject Property, was an area in need of redevelopment pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 et seq. ("LRHL"). Metro Company prepared an investigation dated September 29, 2003 for the Planning Board.  Raheem testified that he did not review the report.

10.      The Planning Board recommended the Redevelopment Area to be in need of redevelopment and the City thereafter designated the Redevelopment Area to be in need of redevelopment pursuant to the LRHL. The date of the Metro Company investigation is the date on which the City Council declared the Subject Property to be in an area in need of redevelopment under the LRHL.

11.      The City accepted the Planning Board's recommendation and declared the North Walnut Street Redevelopment Area as an area in need of redevelopment under the LRHL.  Following the declaration, the City instructed the Metro Company to prepare a redevelopment plan for the North Walnut Street Redevelopment Area. The Metro Company prepared a plan entitled "North Walnut Street Redevelopment Plan" dated December 1, 2003. ("Redevelopment Plan") The Redevelopment Plan was adopted by the City on February 9, 2004 by Ordinance 126-2004.

5

12.     The Redevelopment Plan addressed the entire Redevelopment Area including
the Subject Property. The Redevelopment Plan contained two site plans for the area:
Alternative A and Alternative B. The Redevelopment Plan's preferable plan was Alternative
A. Under Alternative A, the City proposed to relocate Rowley Park from the corner of North
Arlington Street and William Street and move it to the corner of North Walnut Street and
William Street. The Subject Property is located in the middle of the proposed park area. The
Redevelopment Plan contained an alternative proposal, Alternative B. Under Alternative B,
the Subject Property was to be demolished and used for parking and common areas supporting
a new brown stone residential development.

13.     The Redevelopment Plan contains several goals and objectives including:

> To the extent possible, relocate Rowley Park to
> the west, to adjoin North Walnut Street, in order
> to make Rowley Park a more centrally located
> focal point of the community and
> Redevelopment Area, and more fully integrate
> the park into the community and design of the
> Redevelopment Area. (P1, at 4.)

> The Redevelopment Plan contains an
> "Acquisition Map" which segregates the
> properties within the Redevelopment Area into
> three categories:

> > A. To be acquired.
> > B. May be acquired.
> > C. Not to be acquired.

The Subject Property and all adjacent properties along the same side of North Walnut

Street with the exception of a property at the corner of North Walnut Street and Summit Street

are identified as "To be acquired."

**Pre-Demolition Activities and Communications**

14.    On or about December 15, 2003, the Debtor's principal, Michael Feldman,

believed the condemnation of the Subject Property was imminent based on information he

learned from the Debtor's contractor. Based on Mr. Feldman's belief the condemnation of the

Subject Property may be imminent, the Debtor opted not to proceed with any additional

investment in the Subject Property without making an investigation, in order not to lose that

additional investment. The Debtor placed the renovation work on hold while it made a

reasonable investigation of the City's planned redevelopment. At the time rehabilitation

efforts ceased, Boneh had performed roof repairs, demolished the damaged portions of the

Subject Property and installed studs and other construction on the top floor.

15.    Debtor retained counsel, James Turteltaub of Carlin & Ward, to investigate

whether Debtor should continue with its rehabilitation of the Subject Property or whether the

City was intending to condemn the property. As part of his investigation on behalf of the

Debtor, James Turteltaub had a conversation with James Slaughter, the Director of the

Department of Policy, Planning and Development for the City of East Orange, and based upon

that conversation, Debtor's counsel wrote a letter dated April 30, 2004 to Slaughter which

stated in pertinent part:

* * *

7

> 106 North Walnut, L.L.C. purchased the Subject Property by deed
> dated March 17, 2003.  Thereafter, it commenced efforts to rehabilitate
> the property using the services of Boneh Construction, L.L.C.
>
> 106 North Walnut, L.L.C. was informed that in or about December
> 2003 [Slaughter] and East Orange's Construction Official, Mr. Lloyd
> Raheem, advised representatives from Boneh Construction to cease all
> work on the Subject Property's rehabilitation because the City was
> going to demolish the building presumably as part of a redevelopment
> project.
>
> 106 North Walnut, L.L.C. is free to exercise its right to use and enjoy
> the Subject Property until the property is condemned or otherwise
> acquired by East Orange.
>
>          * * *

16. Slaughter showed Turteltaub's April 30, 2004 letter to Raheem who advised that the Construction Office was handling the matter and that the building had been marked an unsafe structure. By letter dated May 11, 2004, Slaughter responded to Debtor's counsel by confirming the property was subject to the Redevelopment Plan which called for its acquisition and demolition.

17. By letter dated June 1, 2004, Debtor's counsel wrote Slaughter and inquired as to whether Debtor would be permitted to rehabilitate its property or whether a redeveloper was to be designated for the property. Slaughter again responded by letter dated June 10, 2004 indicating a redeveloper would be selected for the property.

18. On June 29, 2004, Debtor's counsel met with Slaughter to discuss the situation. During this meeting, Slaughter indicated one redeveloper was to be selected for the entire project area and that the redevelopment would be approximately a $100 million project. At least through this date, neither Raheem nor Slaughter ever directly informed Turteltaub, or any representative

8

of Debtor, that the building had been marked an unsafe structure. Likewise, neither Raheem nor Slaughter ever reached out to Debtor's counsel or the Debtor to inform them of any enforcement order.

19.     Ultimately, Slaughter referred Debtor's counsel to the City Attorney's office. Debtor's counsel then had several communications with the City Attorney's office, including having sent a letter to Michelle Brown, dated July 8, 2004, providing a detailed description of the situation. Debtor's attorney then had several follow-up phone conversations with Michelle Brown regarding the rehabilitation of the Subject Property during July and August, 2004.

20.     Unbeknownst to Debtor's attorney, Ms. Brown left the employ of the City in or about August or September 2004, and there were no responses to Mr. Turteltaub's inquiries. On October 14, 2004, the City's Corporation Counsel, Jason Holt, called Debtor's counsel to discuss the situation.  Holt stated he would look into the matter and provide a response. Thereafter, Ronald Kleckley, Esq., Assistant Corporation Counsel,  responded on behalf of Holt and said he would investigate the situation.

21.     On October 15, 2004, which was the day after Debtor's counsel spoke with Holt, the City posted a second notice of violation on the building. Despite Debtor's counsel's on-going communications with the City regarding the Debtor's desire to rehabilitate the property, neither Debtor nor Debtor's counsel were served with any notice that the demolition was to occur.

22.     Kleckley informed Debtor's attorney on Monday, November 1, 2004, that the City did not have immediate plans to condemn the Subject Property and that the Debtor was free to go ahead with its rehabilitation of the property. During the November 1, 2004 conversation,

9

Debtor's attorney requested Kleckley inform Raheem that Debtor could proceed with its

rehabilitation and that he was not to impede this project.

23.     At 3:55 PM on Thursday, November 4, 2004, Debtor's attorney faxed a letter to

Kleckley memorializing the November 1, 2004 conversation.  Between 3:55 PM and 4:14 PM on

November 4, 2004, Kleckley showed Raheem Turteltaub's November 4, 2004 letter confirming

the property was not going to be condemned and stating Debtor was going to move forward with

the rehabilitation of the Subject Property.  Upon review of the letter, between 3:55 PM and 4:14

PM on November 4, 2007, Raheem stated to Kleckley that the City was going to demolish the

improvements on the Subject Property.

24.     At 4:14 PM, Kleckley left Debtor's attorney a message stating that even though he

had previously stated Debtor could get permits and do what it wanted to do with the building, the

Construction Official said the building was "going to be demolished."

**Demolition of the Subject Property**

25.     The Subject Property continued to stand for over two years after the City first

issued the October 2002 Notice of Unsafe Structure and Enforcement Action. It is undisputed

that rehabilitation efforts by the Debtor or its contractors ceased by December of 2003. In this

regard, Raheem did testify that initial renovation efforts improved the situation; pertinently,

Raheem testified that the building on the Subject Property was in better condition in November

2004 when he ordered it demolished than it was in 2002 after the fire. The concern, however,

was the Debtor's failure to complete the rehabilitation and the fact that the building remained

open and unprotected from the elements and subject to vandalism during the eleven month

period of inactivity.

26.    The City commenced demolition of the Subject Property on or about the evening

of November 4, 2004. Specifically, at approximately 8 PM, in the dark of night, Raheem

instructed Olivra, an employee of T. Fiore to begin demolishing the Subject Property. Olivra,

was told  "I need you to walk this machine over there [106 N. Walnut Street] and start wrecking

this building." Raheem did not give Olivra any reason why he wanted the building demolished.

Although Olivra demolished many buildings for East Orange and other municipalities, this was

the first time someone had just come to him in the field and told him to start knocking down a

building. Olivra commenced the work based on the past relationship his company had with East

Orange demolishing many buildings.

27.    After Olivra had demolished the middle section of the building and the roof had

begun to collapse, Raheem instructed Olivra to stop and indicated that he could continue the

demolition the next morning.

28.    Olivra did not do anything to secure the Subject Property after he commenced

demolition and left the building in a partially collapsed condition. Despite the City's claims that

the Subject Property was occupied by vagrants, no effort was made to find out whether anyone

was in the building or to prevent anyone from entering the building after the demolition was

commenced.

11

29.     Raheem testified that the only effort made to notify the owner of the property prior to the nighttime demolition was the posting of two Enforcement Action notices made on October 17, 2002 and a second made on October 15, 2004 on the building.

30.     Raheem testified that he had proceeded with the demolition in accordance with the procedures specified in  N.J.A.C. 5:23-2.32.  Pursuant to this provision, a copy of the enforcement notice is to be served on the owner after a diligent search.  If the property owner could not be found, then a copy of the notice is to be sent by registered or certified mail to the property owner's last known address. Raheem testified that in his opinion he diligently searched for the owner's address by reviewing the records of the City's tax collector. Indeed, Raheem emphasized that he saw no reason to even mail the second notice since the address of the owner was the same as the property address.

31.     Raheem testified that the basis for the 2004 enforcement notice was the owner's failure to complete the remediation of the unsafe condition upon which the 2002 enforcement notice had been issued. In addition, the building was open at the door and windows, allowing access to vagrants, prostitutes and drug dealers; this open condition, in Raheem's judgment, together with the partial collapse of the roof, created an unsafe structure and danger to the imminent danger to the public health.

32.     At no time prior to the demolition did Raheem inspect the interior of the building. Instead, he viewed the building from the outside, contending that a safe interior inspection was impossible given the deteriorating condition of the building. Likewise, Raheem ordered the demolition without a prior asbestos inspection or notification to PSE&G.

12

**Post Demolition Period**

33.     Upon being notified of the demolition efforts, Turteltaub sent Kleckley a letter to

cease and desist the demolition of the building. Kleckley responded to Turteltaub's letter

demanding the demolition cease and desist by stating the City was going to continue the

demolition. Following Kleckley's response, Debtor's attorney sent a second letter to Kleckley on

November 5, 2004 again demanding the City cease and desist the demolition of the building.

34.     The Subject Property was reduced to vacant land following the demolition.

35.     The Court agrees with and adopts the $1,446,055 valuation of the Subject

Property, as of November 3, 2004 (just prior to the demolition), **if renovated**, rendered by the

City's expert, Everett Moore ("Moore"). Moore based his valuation on an income capitalization

approach which produced a projected net monthly income of $179,000, capitalized at a rate of

12.42%. This valuation results in a per unit valuation of $40,278, which is on the low end of the

$40,000 to $55,000 per unit sales price range for comparable properties, as determined by Mr.

Moore. The $1,446,055 valuation is slightly higher than the calculation of the Debtor's expert,

Louis S. Izenberg, who appraised the Subject Property at $1,334,668, based upon an income

capitalization approach.

36.     The Court agrees adopts a $525,000 valuation of the Subject Property **as vacant**

**land**, as an average of the Debtor's land acquisition cost of $450,000 and the $600,000 valuation

rendered by the City's expert. The Court notes that the expert's $460,000 net valuation is

13

reached only after deducting demolition costs. Such costs would not have been incurred if the Debtor had been permitted to proceed with its rehabilitation efforts.

37.     The Court finds that the Debtor had an enforceable contract with Boneh Construction to renovate the Subject Property at a total cost of $380,000. Likewise, the Court further finds that the Debtor made $107,500 in payments on the contract. Based upon the Subject Property's total 35,068 sq. ft., the renovation costs under the contract was $10.83 per sq. ft. The Marshall & Swift, L.P. industry guide for November, 2004, provides a range for interior build-out costs for Class C finish from $23.41 per sq. ft. for "low cost" finishes to $45.34 per sq. ft. for "good" finishes.

38.     As noted by the City's expert, the contract did not include some essential items, such as parking, paving, elevators, lighting, laundry facilities and appliances. The Court accepts Mr. Moore's uncontroverted testimony that a builder/developer will incorporate a profit range from 10% to 30%, depending upon risk.

39.     The Marshall & Swift industry guide used by Moore to estimate the renovation cost is meant only to value the cost of new construction from the ground up and not to determine renovation costs. As a result, Moore's opinion of rehabilitation costs do not consider what exists on the Subject Property and instead values what it would take to construct a completely new building interior as a segment of the overall cost, including all soft costs, land preparation, etc. of a new building.

40.     On February 28, 2005, 106 North Walnut LLC filed a Voluntary Petition for Relief pursuant to Chapter 11 of the United States Code.  The Debtor filed its Disclosure

14

Statement and Chapter 11 Plan on September 28, 2006.  An Order Confirming Chapter 11 Plan

was entered on May 22, 2007.  The case was subsequently closed on December 20, 2007.  The

Debtor filed the instant Adversary Complaint on August 23, 2005 seeking, among other relief, a

declaration that Defendant inversely condemned the Subject Property and ordering Defendant to

pay Debtor just compensation for its confiscation of the Subject Property.  Defendant filed an

Answer on September 23, 2005.   On August 3, 2007 and several dates thereafter, the parties

appeared for trial.

**IV.    DISCUSSION**

A.    Inverse Condemnation

At the outset, the Court will address the Debtor's theory of liability premised upon

inverse condemnation. As argued by the Debtor, both federal and state courts have recognized a

cause of action for an unlawful taking by a governmental authority, to wit, physically occupying

property without paying just compensation. "Both article I, paragraph 20 of the New Jersey

Constitution and the [f]ifth and [f]ourteenth amendments to the United States Constitution

prohibit the government from taking property without paying just compensation. The protections

afforded under both constitutions are coextensive." Littman v. Gimello, 115 N.J. 154, 161, certif.

denied, 493 U.S. 934 (1989). As held by the U.S. Supreme Court in United States v. Clarke, 445

U.S. 253 (1980):

> The phrase "inverse condemnation" appears to be one that was coined simply as a
> shorthand description of the manner in which a landowner recovers just compensation for
> a taking of his property when condemnation proceedings have not been instituted. As
> defined by one land use planning expert, [inverse] condemnation is a cause of action
> against a governmental defendant to recover the value of property which has been taken
> in fact by the governmental defendant, even though no formal exercise of the power of
> eminent domain has been attempted by the taking agency. A landowner is entitled to

bring such an action as a result of the self-executing character of the constitutional provision with respect to compensation.

Id. at 257. (internal citations omitted). New Jersey Courts have recognized that "[a]n unconstitutional taking occurs not only when the state actually physically occupies private property for public use, it also occurs when the government's excessive use of police powers results in a denial of all economically beneficial use of the property." Pinkowski v. Twp. of Montclair, 299 N.J.Super. 557, 575 (App.Div.1997) (citations omitted). Courts have further recognized under a theory of inverse condemnation a compensable taking occurs when a land owner has been deprived of all reasonably beneficial use of their property. Id. at 575; See also Washington Market Enterprises v. Trenton, 68 N.J. 107, 117-118 (1975).

At trial, the Debtor went to great lengths to persuade the Court that the City intended to acquire the Subject Property for use as either parkland or for parking, as part of its anticipated redevelopment of the area. In this regard, the Court accepts that both Alternative A and Alternative B under the Redevelopment Plan, approved by the City, provided for the acquisition and demolition of the Subject Property. Yet, there has been very little, if any, progress with respect to the redevelopment and it is clear that in order for the City to pursue its redevelopment plans, the City's designated redeveloper would have to compensate the Debtor in an amount at least equal to the fair market value of the Subject Property on the date on which the City declared the property to be in an area in need of redevelopment. N.J.S.A. 20:3-30(d). Notwithstanding, the record does not support a finding that the City undertook the demolition of the building as either a means to effectuate a taking of the Debtor's property or as part of a

16

strategy to reduce the compensation to be paid.[1] As the City points out in its post-trial

submission, there would be little incentive to undertake this strategy since the designated

redeveloper would assume responsibility for demolition and acquisition costs.

At no time has the City issued a declaration of its intent to take the Subject Property and

neither has the Debtor introduced evidence establishing the City's intent in this regard.

Moreover, contrary to the Debtor's position, the record does not support a finding that the City's

decision and acts to demolish the Subject Property were done to prevent the Debtor from

continuing its rehabilitation efforts. Rather, the Court finds that Lloyd Raheem, undertook his

actions in the context of fulfilling his responsibilities as a construction official, motivated by a

desire to abate an unsafe condition and public eyesore.  Finally, the Debtor was required to show

a sufficiently serious interference with the use of its property and deprivation of its economic

benefits."[N]ot every impairment of value establishes a taking...To constitute a compensable

taking, the land owner must be deprived of all reasonably beneficial use of the

property."Greenway Development Co., Inc. v. Borough of Paramus, 163 N.J. 546, 553 (2000)

(citations omitted).  There has been no demonstration that the City has prevented or continues to

prevent the Debtor from rebuilding the structure to a marketable/rentable condition.

Accordingly, the Court does not find that the invocation of inverse condemnation is warranted,

nor do the actions of the City, or its agents, rise to the level of intentional, arbitrary and

capricious conduct.

---

[1]As will be further discussed, such machinations would necessarily require extensive
communication and planning by and among the Construction Official and other City officials.
The evidence suggests quite the opposite. Communication between City departments was quite
lacking, as was the apparent interest and involvement of the Construction Official with respect to
the redevelopment plans.

This is not to say that the Court regards the actions of the City, in the manner in which it proceeded to demolish the Subject Property,  to be consistent with the duties imposed by law and free of liability. As discussed below, this Court finds that the actions undertaken by the City in ordering the demolition of the building to be negligent and contrary to protections afforded property owners under New Jersey law. Thus, Debtor's claims more properly sound in tort, rather than inverse condemnation. New Jersey law recognizes the distinction between inverse condemnation and tort claims. See Greenway Development Co., Inc. v. Borough of Paramus, 163 N.J. 546, 769 (2000) (New Jersey Torts Claim Act inapplicable to inverse condemnation claims).  "Fault or lack of reasonable care, essential to the tort of negligence, simply are not involved in the concept of inverse condemnation. Inverse condemnation is similar to a products liability manufacturing defect case in that the plaintiff in both types of cases is not required to prove fault." Id. (citations omitted).

B.     City's Efforts to Locate Owner and Provide Notice

The Debtor asserts that the City failed to follow the procedures established in the New Jersey Administrative Code before demolishing the Subject Property. Had the City  followed the safeguards established in the Code, the Debtor would have had an opportunity to take the steps necessary to remediate any deficiencies, thus avoiding demolition and the interruption of its rehabilitation efforts.

N.J.A.C. 5:23-2.32(a)(2) provides as follows:

> Notice of unsafe structure:  If an unsafe or unsanitary condition is
> found in a building or structure, the construction official shall
> serve a written notice describing the building or structure deemed
> unsafe and specifying the required repairs or improvements to be
> made to render the building or structure safe and secure, or
> requiring the unsafe building or structure or portion thereof to be

18

vacated or demolished within a stipulated time.  Such notice shall
require the person thus notified to immediately declare to the
construction official his or her acceptance or rejection of the terms
of the order.  Such person may seek review before the
Construction Board of Appeals within 15 days of receipt of the
notice.

Service of notice is defined in <u>N.J.A.C.</u> 5:23-2.33 which states, in relevant part:

...service of notices and orders pursuant to this section shall be
upon the owner or the person specified as agent for receipt of same
in the application for a permit or ...in the case of unsafe structures
upon any agent or person in control of the building. Service may
be made by personal delivery or by leaving a copy at the dwelling
house or usual place of abode of such person, with a competent
member of his household of the age of 14 years or older than
residing therein, or by any other method or upon any other person
approved pursuant to Rules 4:4-4 and 4:4-5 of the New Jersey
Supreme Court, or which is otherwise consistent with due process.

The Construction Official, Lloyd Raheem, testified[2] that the only effort made to notify

the owner of the Subject Property prior to the demolition was the posting of two Enforcement

Action notices, one made on October 17, 2002 and a second made on October 15, 2004 on the

building.  Raheem further testified that in order to locate the owner of the Subject Property he

reviewed the City's tax collector's records for the address.  The address listed in those records

was the same as the Subject Property.  The Debtor argues that Raheem's efforts were insufficient

and non-compliant with the requirements of the Statute.  The City maintains that Raheem had no

obligation to look beyond a stale or incorrect address provided by the Debtor to the City.  The

Code provides for the instance when an owner of an unsafe structure cannot be found.

Specifically, <u>N.J.A.C.</u> 5:23-2.32(a)(4) provides as follows:

---

[2]While the Court respects Mr. Raheem's experience, the defensive and obstructionist
manner in which he gave testimony, both during his pre-trial deposition and at trial, raises
questions for the Court as to his credibility and motivations.

Posting notice of unsafe structure:  If the person addressed with a notice of unsafe
structure cannot be found within the municipality after diligent search, then such
notice shall be sent by registered or certified mail to the last known address of
such person, as on file with the office of the tax collector, and a copy of the notice
of unsafe structure shall be posted in a conspicuous place on the premises...

It is clear from the statute that if, after a diligent search, the address of person to whom

the notice of unsafe structure is addressed is not found, the notice can be mailed to the last

known address of that person as listed in the office of the tax collector.  Raheem  testified that, in

his opinion, he diligently searched for the owner's address by reviewing the records of the City's

tax collector. The statute, however, does not say that a review of tax collector's file is considered

a "diligent search."

Whether a search is diligent is a matter of substance, not form.  Black's Law Dictionary

defines diligence as "1. A continual effort to accomplish something. 2. Care; caution; the

attention and care required from a person in a given situation."  Included in this definition are

various types and degrees of diligence ranging from slight diligence, "the diligence that a person

of less than common prudence takes with his or her own concerns" to extraordinary diligence

which is "extreme care that a person of unusual prudence exercises to secure rights or property."

Common diligence, also known as due diligence, is defined as "the diligence reasonably

expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or

to discharge an obligation."  Thus, diligence, as defined, is a continual effort necessitating some

degree of care.

Raheem testified that his search for the owner of the Subject Property was limited to a

search of the tax collector's records.  Since the listed owner of the Subject Property had the same

address as the Subject Property, Raheem posted the notice there.  He also testified that he saw no

20

reason to mail the second notice since the address of the owner was the same as the property address.[3]   It is unclear whether the first notice was mailed and if so, what ultimate destination it reached.   However, it is clear that Raheem saw the futility in mailing the second notice since the address of the owner was the same as the address of the Subject Property.   This fact alone should have compelled Raheem to continue his search efforts in the first instance.   Furthermore, Raheem was aware that the Debtor had retained counsel in connection with the proposed condemnation of the Subject Property.   On two occasions Raheem was presented with letters from Turtletaub about the status of the Subject Property.   In fact, the first letter from Turtletaub came less than 6 months prior to the issuance of the second notice.   Clearly, then, when the second notice was issued, Raheem could have, and indeed should have, picked up a telephone or sent a written memo or email to the legal department, if not other departments[4], and inquired as to whether anyone had contact information regarding the owner of the Subject Property.

---

[3]Mr. Raheem's explanation seems to overlook the admittedly remote possibility that the owner could have made arrangements with the post office to have mail forwarded to another address. While it is unknown whether the Debtor ever tried this approach and would have received notice of the violation(s), certainly Mr. Raheem's failure to drop a letter in a mailbox ignored this possibility.

[4]Evidence was introduced at trial by the Debtor indicating that on at least one other occasion, a summons had been issued against the Subject Property for property maintenance violations and that the summons had been received by a neighboring property owner who then forwarded the summons on to the proper party. Thus, Mr. Raheem could have checked with the municipal court administrator for any relevant information. The question is not whether Mr. Raheem would have been successful in locating an address for the owner-we will never know; rather, the issue is whether his failure to explore other alternatives supports a finding that his efforts were less than diligent. This Court would be remiss in failing to note that Mr. Raheem's testimony, wherein he acknowledged that he had never read the Redevelopment Plan notwithstanding his position as a voting planning board member, certainly suggests an indifference towards his responsibilities.

Accordingly, the Court finds the City failed to conduct a diligent search to find the owner of the Subject Property.

C.      Urgency of Demolition of the Subject Property

The City commenced demolition of the Subject Property on or about the evening of November 4, 2004.  Raheem testified that the building was open at the door and windows, allowing access to vagrants, prostitutes and drug dealers and this open condition, in Raheem's judgment, together with the partial collapse of the roof, created an unsafe structure and danger to the imminent danger to the public health.  This imminent danger led Raheem to instruct Olivra to begin demolishing the Subject Property.

The Code sets forth "Emergency Measures" to be considered when undertaking an "Emergency Demolition" pursuant to N.J.A.C. 5:23-2.32(b).  Under this section of the Code the following are the requirements for emergency demolitions:

(b) Emergency measures:

1. When, in the opinion of the construction official and appropriate subcode officials, there is actual and immediate danger of failure or collapse of a building or structure or any part thereof which would endanger life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the building or structure, the construction official is hereby authorized and empowered to order and require the occupants to vacate the same forthwith. The construction official shall cause to be posted at each entrance to such building a notice reading as follows: This structure is unsafe and its use or occupancy has been prohibited by the construction official, and it shall be unlawful for any person to enter such building or structure except for the purpose of making the required repairs or demolishing the same. The order of the construction official shall be effective immediately.

2. Temporary safeguards: When, in the opinion of the construction official, there is actual and immediate danger of collapse or failure of a building or structure or any part thereof which would endanger life, the construction official shall cause the necessary work to be done to render such building or structure or part thereof

temporarily safe, whether or not the legal procedure herein has been instituted.
Such work may include such demolition as may be necessary in order to eliminate
any actual and immediate danger to human life; provided, however, that any
demolition work shall not commence until at least 24 hours following service of
notice of the pending demolition upon the owner, unless such service is not
possible because the identity or the address of the owner cannot be determined
from public records. Upon expiration of the 24-hour period, demolition may
proceed unless stayed by order of the Superior Court.


3. Closing streets: When necessary for the public safety, the construction official
may temporarily close sidewalks, streets, buildings and structures and places
adjacent to such unsafe structure, and prohibit the same from being used.

4. Emergency repairs or demolition: For the purpose of this section, the
construction official shall employ the necessary labor and materials to perform the
required work as expeditiously as possible.

5. Costs of emergency repairs: Costs incurred in the performance of emergency
work shall be paid from the treasury of the jurisdiction on certificate of the
construction official; and the legal authority of the jurisdiction shall institute
appropriate action against the owner of the premises for the recovery of such
costs.

6. Appeals: An emergency order issued by a municipal construction official
pursuant to this subsection shall be appealable only to a court of competent
jurisdiction.


At no time prior to the demolition did Raheem inspect the interior of the building.

Instead, he viewed the building from the outside, contending that a safe interior inspection was

impossible given the deteriorating condition of the building. Likewise, Raheem ordered the

demolition without a prior asbestos inspection or notification to PSE&G. Raheem did not

undertake any of these required precautions in order to ensure safe demolition of the building. In

addition, subsection (b)(2) requires 24 hour notice of the demolition to the owner. The only

effort to notify the Debtor prior to the demolition was the posting of the two Enforcement Action

notices made on October 17, 2002 and October 15, 2004 on the building. No efforts to notify the

Debtor of the impending demolition were made within the 24 hour period prior to demolition. The only indication that demolition was imminent was Raheem's response to Kleckley after reviewing Turtletaub's November 4, 2004 correspondence. It was then that Raheem indicated his intention to demolish the Subject Property. This was only 4 hours before the demolition took place and not the required 24 hours per the Code.

The Court finds no urgency to demolish the Subject Property existed. The Subject Property stood untouched for at least eleven months between the time the rehabilitative efforts ceased and the demolition. It's probable that the building would have stood another day in order for the City to comply with the notice requirements of the Code. Moreover, Raheem's concern that the building was an imminent danger does not comport with his testimony that initial renovation efforts improved the situation and that the Subject Property was in better condition in November, 2004 than it was in 2002 after the fire. It is clear to the Court that the City utilized the initial 2002 Notice as a means to impel the owner of the Subject Property to remediate the unsafe conditions and various property maintenance violations. Thus, when the owner obtained construction permits and commenced rehabilitation efforts, the City was content to sit back and wait. Even when those renovations ceased, the City did nothing for eleven months; yet, the City wishes the Court to believe that there was a sudden imminent danger to public safety, warranting the immediate night-time emergent demolition of the building. The Court simply does not accept this proffer. Rather, one could say that the true threat to public safety may be found in conducting a night-time demolition of a building believed by the construction official to be occupied by prostitutes, drug addicts and vagrants (are they not entitled to some measure of public safety?).

24

D.     Comparative Negligence

Having determined that the City acted negligently does not end the inquiry. Rather, as argued by the City, this Court deems it appropriate to apply New Jersey's Comparative Negligence Act, as set forth in N.J.S.A. 2A:15-5.1 et seq. The Comparative Negligence Act modified the Joint Tortfeasors Contribution Law to require that contribution be calculated by percentage of fault assigned by the trier of fact. Steele v. Kerrigan, 148 N.J. 1 (1997) (Stein, J.); 47 NJPRAC §23:7. "A plaintiff's contributory negligence does not bar a recovery by a plaintiff." Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102 (2004). Nevertheless, the Comparative Negligence Act states that:

> "Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought or was not greater than the combined negligence of the persons against whom recover is sought. Any damages sustained shall be diminished by the percentage sustained of negligence attributable to the person recovering."

N.J.S.A. 2A:15-5.1.

Simply put, "a plaintiff who is found to be more than fifty percent at fault is entitled to no recovery. A plaintiff who is found to be fifty percent or less at fault is entitled to a recovery, but any award of damages is diminished by the percentage of negligence attributed" to the plaintiff. Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102.

The Debtor, as a property owner, had a continuing obligation to remediate any property maintenance violations, timely complete construction reflected in the issued permits, periodically visit the property, provide the City with current contact information, comply with all zoning ordinances (including the obligation to secure a certificate of conformity) obligations and to

update the City with any changes of address or relevant information. The Debtor failed miserably

with respect to these obligations and such failures played an integral part in the events that took

place in this matter. Certainly, it was reasonable for the Debtor to cease infusing money and time

into renovating the Subject Property, once it learned of the City's redevelopment plans.

Likewise, the Court views as both reasonable and necessary the efforts of Debtor's counsel to

obtain direction from the City of East Orange. Yet, it is wholly inexplicable for the Debtor to

have left the Subject Property in its state of disrepair for eleven months, while not

communicating directly with the City's construction office. While the evidence establishes that

there were periodic communications between Debtor's counsel and the City's corporate counsel

office from the Spring through the Fall of 2004 (sufficient certainly to warrant contact by the

City with counsel prior to the demolition), the failure to address with the construction office the

existing structural deficiencies was inexcusable. Accordingly, this Court attributes to the Debtor

25% of the fault in this matter.

E.      Damages

        In calculating damages to be awarded, the record in this matter offers the Court a "mixed-

bag" of information from which draw.  The Court has utilized the opinions and information

provided by the experts for both the Debtor and the City in calculating a damage award. It is the

intent of the Court that the damage award reflect compensation to the Debtor for the lost The

opportunity to complete the renovations of the Subject Property and receive the profits to be

earned by having a fully- rented 36 unit apartment building. In essence, the Debtor should

recover the value of the property, as of November 3, 2004, the day before the demolition.  The

difficulty facing the Court is that the Debtor did not have a habitable apartment building on

November 4, 2004, and there was no evidence introduced as to the length of time necessary to

complete the rehabilitation, nor definitive information on the costs to be incurred in doing so.

We start the damage calculations with the value of the Subject Property, if completely

renovated and rented to a reasonable level, consistent with industry expectations.[5]   Obviously,

we must subtract from this value the anticipated costs of the renovations, as well as the value of

the vacant land since the Debtor still retains this asset. We must then add back the Debtor's

outlay of funds for repairs made prior to the demolition. This valuation must then be reduced by

25% , representing the Debtor's determined percentage of fault.

The calculation would appear to be straightforward, yet the parties have dramatically

different views as to the proper costs of the renovations.  The City, through their expert, argue

for renovations at $45.34 per sq. ft., based upon interior build-out costs for a Class C "good"

finish set forth in the Marshall & Swift, L.P. industry guide for November, 2004. In contrast, the

Debtor submits that its $380,000 contract with Boneh Construction, which amounts to $10.83

per sq. ft., reflects the proper costs. In light of the deteriorating structures and conditions in the

neighborhood, no builder/developer would consider incurring the costs for a "good" finish, as

opposed to a "low cost" finish. Moreover, the Court agrees with the Debtor's expert that the

figures in the Marshall & Swift industry guide are not directly applicable to renovation work,

where certain soft and hard costs need not be factored-in. However, it is equally obvious that the

contract with Boneh excluded many essential costly items, such as parking, paving, elevators,

lighting, laundry facilities and appliances. Unfortunately, neither party submitted evidence as to

the costs of these items. Thus, the Court has employed an alternative method for calculating the

---

[5]For more detailed discussion of valuation findings, the parties are referred to Findings of
Fact, Nos. 35-39, supra.

renovation costs, based upon information found directly in the record. Specifically, the Court has

determined that the renovation costs which the Debtor could reasonably have been expected to

incur can be calculated by taking the appraised value of the completed and rented apartment

building, and then subtracting the land acquisition costs and a reasonable builders' profit. The

Court has utilized a 20% profit figure, which falls directly in the middle of the 10% - 30% profit

range suggested by the City's expert , and reaches the following figure for renovation costs:


$1,446,055 (City appraised value)

- 20% (builder's profit)

$1,156,844

-$450,000 (land acquisition)

$706,844 (renovation costs) = **$20.16 per sq. ft.**


Using these renovation costs, the Court calculates damages as follows:

$1,446,055 (City appraisal at cost)

 -$525,000 (vacant land value)`

 -$706,844 (renovation costs)

 +$107,500 (Debtor's documented repair costs)

$321,711

less 25% comparative negligence = **$241,283 Damages**

The Court does not regard ongoing debt service and related costs as the responsibility of

the City. The above calculation would be the same, whether or not the building was mortgaged

28

or owned outright. The Court will compensate the Debtor for the lost time value of money by directing that the damage award will accrue interest at the federal judgment rate, commencing November 4, 2004, until the judgment is satisfied. The Court will further direct that the City remove the existing demolition lien, as the Court has found that the demolition was undertaken in a manner inconsistent with the law and possibly could have been avoided. All parties will bear their respective attorneys fees. Plaintiff shall submit a proposed form of judgment and counsel are directed to contact Chambers to schedule a status conference with respect to the pending real estate tax appeal.

Dated: January 22, 2008

Honorable Michael B. Kaplan
United States Bankruptcy Judge